## GRIESSER and others *v.* McILRATH, Receiver, etc.

*(Circuit Court, D. Minnesota.* June Term, 1882.)

DISCRIMINATION IN RAILROAD FREIGHTS—DAMAGES, HOW COMPUTED.

> Where at a former term of the court it was decided that the receiver of a railroad company, by the adoption of a contract with a third party and settlements with him thereunder, had discriminated against the plaintiffs in the rates charged them for transportation of wheat and grain over the railroad operated by him contrary to the provisions of the state statute, and that plaintiffs were entitled by law to have their grain transported over said road at rates which would put them on an equal footing with said third party for like transportation, and it was referred to a special master to take an account of the amount of such unfavorable discrimination, and to report the result of such examination, *held,* that the amount of the fund which, under the contract, could be used to pay such third party's commissions, and all expenses incident to the business and the receiver's freights, is the difference between the prime cost of the wheat shipped and the net proceeds of sales, deducting freights and charges incurred upon other roads and after the shipment left the receiver's road; and that the amount of discrimination is the difference between such amount, after deducting therefrom expenses, compensations, rent of warehouses, interest, exchange, insurance, and the outlay at way stations made by the receiver to secure the trade, and the amount of the freight charged to such third party according to tariff rates; and that a decree be entered accordingly.

*Gilman & Clough,* for plaintiffs.

*Henry J. Horn,* for defendant.

NELSON, D. J. At the December term, 1877, this court decided that the receiver, by the adoption of the contract with J. C. Easton of August 15, 1872, and the settlements with him thereunder, had discriminated against the plaintiffs in the rates charged them for transportation of wheat and grain over the railroad operated by him between May 6, 1873, and March 4, 1874, contrary to the provisions

in that behalf of the act of the legislature of the state of Minnesota approved March 6, 1871, and that the plaintiffs were entitled by law to have their grain transported over the said railroad at rates which would put them on an equal footing with the said Easton for like transportation of grain under the said Easton contract or agreement, which is hereinafter set forth in full, and to a decree for the amount of such unfavorable discrimination, and it was referred to George B. Young, Esq., a special master, to take an account of the amount of such unfavorable discrimination, and to report the result of such examination, together with all the *data* necessary to enable the court to render a final decree. The master was granted power and authority to examine, if necessary, the parties, their books, and such witnesses as the parties might severally produce before him, in addition to the proofs already taken. The contract or agreement, by the adoption of which the receiver did discriminate against the plaintiffs, is in the following words:

"Memorandum of an agreement made this fifteenth day of August, 1872, between J. C. Easton, party of the first part, and the Southern Minnesota Railroad Company, party of the second part, witnesses: That J. C. Easton, party of the first part, agrees to furnish warehouses and elevators, at all stations on the line of the Southern Minnesota Railroad, suitable for handling grain and other produce, at fair and reasonable rents and employ agents, and men to buy and handle grain and other produce, at said stations, in the interest of, and at such prices, as the president and manager of the Southern Minnesota Railroad Company may direct, and shall have such grain and other produce sold in Milwaukee, or elsewhere, as may be agreed, at a cost not exceeding one cent per bushel for grain, and at corresponding rates of commission for other produce.

"Said J. C. Easton, party of the first part, further agrees that he will employ competent buyers and agents, and will be responsible for the honest and faithful performance of their duties in buying, handling, grading, and management of grain and other produce, and promptly pay any damages occurring through a failure to perform such duty, and will keep correct account of all expenses attending the performance of this business, and render an account of the same once a week, when all settlements shall be made and differences paid. The Southern Minnesota Railroad Company, party of the second part, in consideration of the foregoing, and the energetic superintendence of this business by the party of the first part, agrees to allow the party of the first part three-quarters of a cent per bushel profit for all grain, and three-quarters per centum profit on the gross sales of the other produce, handled under this contract, and also to pay the expenses of buying and handling the same, and 10 per centum on all money used in the transaction of said business.

"The object of the foregoing agreement is to enable the Southern Minnesota Railroad Company to regulate and control the business along its line, and to

sustain the rates of freight, and is to be explained as follows: J. C. Easton is to buy and own the grain and other produce, but at prices dictated by the Southern Minnesota Railroad Company. He is to make immediate sales by telegraph, and after paying the costs of handling and necesssary and legitimate expenses, added to three-quarters of a cent per bushel on grain, and three-quarters of one per cent. on the gross sales of other produce, as profit to himself, is to pay the residue to the Southern Minnesota Railroad Company as their freights. Settlements to be made once a week, and all differences paid, and this agreement may be terminated by either party at any time.

"In testimony whereof the parties hereunto have signed and delivered the same this fifteenth day of August, 1872.

"J. C. EASTON,                         [Seal.]

"THE SOUTHERN MINNESOTA RAILROAD COMPANY,

"By CLARK W. THOMPSON, President."

Sections 4 and 7 of the act of legislature of the state of Minnesota approved March 6, 1871, entitled "An act to regulate the carrying of freight and passengers on all railroads in this state," reads as follows:

"Sec. 4. It shall be the duty of all railroad companies and corporations in this state to receive all freights of the kind mentioned in this act at any depot or station of such company or corporation, whenever brought to such depot for transportation, and to provide suitable places for the storage and reception of such freight at all of its depots and stations. And all railroad companies and corporations shall furnish equal facilities for transporting, and shall transport freights of every description in this state to and from warehouses or elevators other than those owned by any such company or corporation at the same rates, as from warehouses or elevators owned by such company or corporation, and shall make no discrimination in favor of nor against any warehouse or elevator."

"Sec. 7. That all railroad companies or corporations doing business in this state shall transport all freights ordered for transportation within a reasonable time, and in the order of the reception of the same for carriage; and if any railroad company or corporation shall transport freights of any description for any person or persons, corporation, company, or association, at rates less than are provided in this act, then such company or corporation shall thereafter transport freights of the same description over its line of railroad for all other persons at the same reduced rates during the time such discrimination is in force."

The master has given great attention to the case, and furnished full *data* upon which he bases his report, and finds that the amount of discrimination in favor of Easton under the contract is 3.97-100 cents on each and every bushel shipped by him at each of the stations where the plaintiffs made shipments during the period of their shipments. The freight charged to Easton according to tariff rates is $193,403.48. The only fund which under the contract could be used to pay Easton's commissions, and all expenses incident to the business

along the line of the road and the receiver's freights, is the difference between the prime cost of the wheat shipped and the net proceeds of sales, deducting freights and charges incurred upon other roads, and after the shipment left the receiver's road. The master has taken the purchase records, and on examination finds the amount of wheat purchased 1,668,322 58-60 bushels, at a cost of $1,534,106.66, and the quantity sold 1,668,023 36-60 bushels, for the net price of $1,714,-573.13, and deducting the prime cost from the net proceeds of the sales there is available for payment of freight, etc., $180,466.47.

The salaries and wages paid by Easton under the contract, according to the latter's testimony, which he was entitled to be allowed in the purchase of wheat, is $35,000, and the compensation for rent of warehouses, interest, exchange, and insurance, $18,550; and his commission, at ¾ per cent. per bushel to September 1, 1873, and 1 per cent. per bushel from September 1, 1873, amounts to $14,884.15. The aggregate of these sums must be deducted from the $180,446.47, before the receiver was entitled to be paid for freight, which gives the result:

| | | |
|---|---:|---:|
| Difference between prime cost and net sales, | | $180,446 47 |
| Expense, | $35,000 00 | |
| Compensations, | 14,884 15 | |
| Rent of warehouses, interest, exchange, and insurance, | 18,550 00 | |
| | | 68,434 15 |
| Balance, | | $112,012 32 |

There is another item which, it is claimed, should be allowed Easton as a credit on freight charges, and be added to the balance found of $112,012.32.

It appears from the evidence that at several small stations where wheat could be purchased and a market opened which might be productive of substantial benefit to the receiver's road, some $12,000 of expenses were incurred. The business at these stations did not pay expenses at the time, but the receiver, in his effort to secure the trade, undertook this outlay, and the item has been allowed by the master as a credit to apply on Easton's freight charges. I think the receiver was justified in making this expenditure, and the master very properly has so reported. This would increase the amount to be applied on freight charges to $124,012.32. The freight charged to Easton, according to the regular tariff, is found to be $193,403.48. The deficiency is $69,391.16, which represents the discrimination on

Easton's wheat, amounting 3 97-100 cents per bushel. The answer admits the shipments made by the complainants, and the number of bushels. A decree will be entered in their behalf and against the defendant, and it is referred to the clerk, as master, to make the computation and report.

McCRARY, C. J., concurring.

See *Hays* v. *Pennsylvania R. Co.* 12 FED. REP. 309, and note, p. 314; *Texas Express Co.* v. *Texas & Pac. R. Co.* 6 FED. REP. 426: *Same* v. *Inter. & Grand Northern R. Co.* Id.; *Tilley* v. *Savannah, F. & W. R. Co.* 5 FED. REP. 641.